IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ADIDAS AMERICA, INC. and ADIDAS    )
AG,    )
    )
            Plaintiffs,    )    Civil Case No. 04-174-KI
    )
    vs.    )    OPINION AND ORDER
    )
THE TOPLINE CORPORATION,    )
    )
            Defendant.    )
——————————————————————    )

        Stephen M. Feldman
        Perkins Coie LLP
        1120 N. W. Couch Street, Tenth Floor
        Portland, Oregon  97209-4128

        William H. Brewster
        R. Charles Henn, Jr.
        Charles H. Hooker
        Kilpatrick Stockton LLP
        Suite 2800
        1100 Peachtree Street
        Atlanta, Georgia  30309

            Attorneys for Plaintiffs

Steven T. Lovett
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, Oregon  97204

William O. Ferron
Nathaniel E. Durrance
Seed IP Law Group PLLC
701 Fifth Avenue, Suite 5400
Seattle, Washington  98104

       Attorneys for Defendant

KING, Judge:

adidas America, Inc. and adidas AG (collectively, "adidas") bring this trademark

infringement action against The Topline Corporation ("Topline") over shoes for which Topline

was the buying agent.  adidas claims the shoes bear confusingly similar imitations of adidas's

registered trademarks and trade dresses.  Before the court is Defendant The Topline

Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (#27).  For the reasons below,

I grant the motion and dismiss the action without prejudice.

## FACTS

According to Richard Philby, Topline's Chief Operating Officer, Topline is a Washington

corporation with its principal and only place of business in Bellevue, Washington.  Topline has

never been licensed to do business in Oregon and has never had a designated agent for service of

process here.  Fred Meyer was a Topline customer in the 1980s.  For the last 20 years, Topline

has not had any customers, offices, bank accounts, telephone numbers, assets, warehouses,

manufacturing facilities, or employees in Oregon.

Topline provides buying agent services to companies that purchase shoes manufactured in foreign countries. Its customers buy the shoes directly from the foreign manufacturer, import the shoes into the United States, and sell the shoes to customers. Topline does not manufacture, purchase, import, or sell the shoes.

Philby describes buying agent services as assisting the customer in identifying shoe designs; sourcing the manufacturing with factories in Asia, India, and Brazil; negotiating prices; and inspecting for quality. Identifying designs includes traveling overseas to shop for trends, developing designs incorporating the trends, making samples overseas, and presenting samples to the customer at a trade show or the customer's place of business.

All of the allegedly infringing shoes pictured in the First Amended Complaint are sold by Payless. Some of the models were sold in all Payless stores in the United States, including stores in Oregon.

Topline provided foreign buying services for the accused shoes, which were manufactured in China for Payless. Topline provided its services to Payless, headquartered in Topeka, Kansas, and traveled to China to perform the services. Topline developed trends, had sample shoes manufactured overseas, and presented the samples to Payless. These samples shoes were never offered for sale. Payless bought the accused shoes directly from the Chinese manufacturer, imported them into the United States, and distributed and sold the shoes in the United States.

Philby also states that Topline does not specifically design any products for the Oregon market, does not advertise in Oregon, has no established channels for providing regular advice to customers in Oregon, has not set up any distribution networks in Oregon, and has not marketed

or sold any products through a retailer or distributor that agreed to serve as a sales agent in

Oregon.  All distribution of the accused Payless shoes was done by Payless with no control or

input by Topline.  Once the manufacturing order is placed, Topline notifies the factory of the

location of the consolidator, the entity that arranges the shipping for Topline's customer.  Topline

has no further involvement in the shipping or distribution.

In 2001, there was a meeting between Topline sales staff and Payless buyers.  A Payless

employee's meeting notes state that Topline's job is "to find validated styles and interpret them

for [Payless] and find a place to make those shoes."  Henn Decl. Ex. 16 at 2.  The notes also

state:  "An Adidas look a like 4 stripe (silver stripe) with a clearish blue bottom is coming in all

stores."  Id.

Before Topline provided buying agent services to Payless for any of the shoes at issue,

Topline was advised by Payless that its 1994 agreement with adidas allowed Payless to sell two

and four striped shoes, as long as the stripes did not have serrated edges.  Relying on Payless's

representations, Topline believed that Payless could lawfully manufacture, import, and sell the

two and four striped shoes for which Topline provided buying agent services.  Topline was aware

that adidas sued Payless in November 2001 alleging that Payless's two and four striped shoes

infringed adidas's trademark and trade dress rights.  Topline was aware that this court granted

summary judgment in Payless's favor in January 2003, that the Ninth Circuit reversed the

summary judgment in January 2006, and that the Ninth Circuit returned the case to this court in

April 2006 for eventual trial.

In 2005, Topline purchased a trade show booth from an Oregon company, Pinnacle, for

use in a trade show in Las Vegas.  Also in 2005, Topline began using an Oregon company, NIAS,

to test soles of shoes.  Several of Topline's current customers have retail outlets in Oregon but are headquartered elsewhere.  No retail outlets other than Payless are implicated in this case.

Topline has a small portion of its business referred to as the "landed" business.  Topline arranges for the shoes to be manufactured overseas and shipped to the customer's distribution center.  Topline buys these shoes from the manufacturer and sells them to Topline's customer. Topline had some landed business about 15 years ago which came to an end and picked up again three years ago with two customers, Aeropostale and Justice, both of which have retail outlets in Oregon.

## LEGAL STANDARDS

The plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant.  Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements, 328 F.3d 1122, 1129 (9th Cir. 2003).  If no evidentiary hearing is held, a plaintiff can withstand a motion to dismiss by making a prima facie showing of jurisdictional facts which, if true, support jurisdiction over the defendant.  Allegations in the complaint must be taken as true and conflicts between the facts must be resolved in the plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.  Id.

## DISCUSSION

Topline contends that it acts as a buying agent for companies like Payless.  According to Topline, it does not buy the shoes from the foreign manufacturer, does not import the shoes into the United States, and does not sell the shoes to American companies.  Topline maintains that Payless's contacts with Oregon cannot be attributed to Topline to establish personal jurisdiction. Topline also argues that only Payless shoes are at issue in this case and not the shoes of any other

Topline customer.  Thus, Topline claims that its contacts related to other customers are not relevant.

adidas argues that Topline's buying agent activities include designing the infringing footwear and causing it to be manufactured, imported, and sold to retailers which market nationally, including in Oregon retail stores.  Because Topline intentionally infringed adidas's trademarks and trade dress, knowing that adidas is headquartered in Oregon, adidas contends that Topline knew that the harmful effects of its action were purposefully directed at Oregon.  adidas claims that personal jurisdiction is properly exercised when a buying agent puts goods into the stream of commerce and the buying agent anticipates the goods will ultimately be sold in the forum state.

If no applicable federal statute governing personal jurisdiction exists, the court applies the law of the state in which the court sits.  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004).  Oregon extends jurisdiction to the outer limits permitted by either the state or federal constitutions.  ORCP 4L.  Thus, I can turn to a federal due process analysis.

Federal due process requires that a nonresident defendant has minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  The constitutional due process test may be satisfied by a finding of either general or specific jurisdiction.  When a defendant has "substantial" or "continuous and systematic" contacts with the forum state, general jurisdiction is proper even if the cause of action is unrelated to the defendant's forum activities.  Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082,

1086 (9th Cir. 2000).  The standard is "fairly high" and requires contacts that approximate

physical presence.  Id.

adidas does not argue that Topline has substantial contacts with Oregon sufficient to

support general jurisdiction over the company.

When general jurisdiction is inappropriate, the Ninth Circuit has recognized application

of a three-part test to determine whether specific jurisdiction exists:

> (1) The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform some
> act by which he purposefully avails himself of the privilege of conducting
> activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and (3) the exercise of jurisdiction must comport with
> fair play and substantial justice, i.e. it must be reasonable.

Schwarzenegger, 374 F.3d at 802 (internal quotation omitted).

The plaintiff has the burden of satisfying the first two prongs of the test or personal

jurisdiction is not established in the forum state.  If the plaintiff is successful, the burden shifts to

the defendant to present a "compelling case" that the exercise of jurisdiction would not be

reasonable.  Id.

I.      Purposeful Direction

The first element ensures that a "defendant's conduct and connection with the forum

State are such that he should reasonably anticipate being haled into court there."  World-Wide

Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559 (1980).

> We often use the phrase "purposeful availment," in shorthand fashion, to include
> both purposeful availment and purposeful direction, but availment and direction
> are, in fact, two distinct concepts.  A purposeful availment analysis is most often
> used in suits sounding in contract.  A purposeful direction analysis, on the other
> hand, is most often used in suits sounding in tort.

Page 7 - OPINION AND ORDER

A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. By taking such actions, a defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. In return for these benefits and protections, a defendant must–as a quid pro quo–submit to the burdens of litigation in that forum.

A showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere.

Schwarzenegger, 374 F.3d at 802-03 (9th Cir. 2004) (internal quotation and citation omitted).

adidas contends that Topline purposefully directed its activities towards Oregon under both the effects test and the stream of commerce test.

A.    Effects Test

Purposeful direction is evaluated under the three-part effects test arising from Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984). To meet the effects test, the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm that the defendant knows is likely to be suffered in the forum state. Schwarzenegger, 374 F.3d at 803 (element of purposeful direction at California not met when car dealer's advertisement using the likeness of Schwarzenegger was published in an Ohio newspaper). See Bancroft & Masters, 223 F.3d at 1087-88 (Georgia defendant was found to have purposefully directed activities at California when it sent a letter to the registrar of Internet domain names, located in Virginia, challenging the domain name of a California company and triggering the dispute resolution policy); Gordy v. Daily News, L.P., 95 F.3d 829, 833 (9th Cir. 1996) (New York newspaper and its columnist were brought into California court where the defamed plaintiff lived and the newspaper had a small but steady circulation); Metropolitan Life

Page 8 - OPINION AND ORDER

Insurance Co. v. Neaves, 912 F.2d 1062 (9th Cir. 1990) (Alabama resident was brought into a California court on the basis of a letter she sent to an insurance company in California stating that she was entitled to an insurance payment actually belonging to a California resident).

Under the effects test, adidas alleges that Topline intentionally infringed adidas's trademark and trade dress rights on shoes which Topline knew would be distributed by Payless in all of its stores in the United States, including in Oregon.  adidas also argues that Topline knew that adidas was headquartered in Oregon and thus knew that the harmful effects of the infringement would be felt by adidas in Oregon, no matter where the majority of the infringing shoes were sold.  adidas points to Topline's conduct in allegedly copying and presenting the shoes to Payless as the intentional act aimed at Oregon.

Topline argues that it committed no act that could be defined as infringement, because it never owned the accused shoes.  Based on the agreement between adidas and Payless, Topline claims that it could not have the intent to infringe adidas's rights.  According to Topline, it could not have expected that doing business with Payless, based in Topeka, Kansas, would subject it to suit in Oregon.  Topline contends that adidas confuses conduct that might have a foreseeable consequence in Oregon with alleged intentional conduct that is expressly aimed at Oregon. Topline argues that there is no evidence that it performed acts to harm adidas and for the purpose of having the consequences felt in Oregon.  According to Topline, knowing that adidas's principal place of business was located in Oregon is inadequate to satisfy the effects test.

Under the effects test, it is insufficient that the intentional act caused harm in the forum state; the act must also have been expressly aimed at the forum state.  Schwarzenegger, 374 F.3d

at 807 (advertisement using Schwarzenegger's likeness was aimed at Ohio to attract local

customers and not at California, the forum state and where Schwarzenegger lived).

adidas primarily relies on two cases:  Panavision and Bancroft & Masters.  In Panavision

International, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998), defendant "engaged in a scheme to

register Panavision's trademarks as his domain names for the purpose of extorting money from

Panavision.  His conduct, as he knew it likely would, had the effect of injuring Panavision in

California where Panavision has its principal place of business and where the movie and

television industry is centered." Id. at 1322.  Defendant also sent a letter to Panavision in

California demanding $13,000 in exchange for the domain name.  Id. at 1319.  The court held

that the purposeful availment requirement was satisfied.  Id. at 1322.

In Bancroft & Masters, defendant Augusta National sent a letter to the registrar of domain

names, located in Virginia, to challenge Bancroft & Masters' ("B&M") use of the domain name

masters.com.  Augusta National also sent a letter to B&M, located in California, demanding that

B&M cease and desist its use of masters.com and immediately transfer the domain name to

Augusta National.  Id. at 1085.  The court reasoned that the "letter was expressly aimed at

California because it individually targeted B&M, a California corporation doing business almost

exclusively in California." Bancroft & Masters, 223 F.3d at 1088.  This express aiming was

sufficient to satisfy the effect test.  Id.

In both Panavision and Bancroft & Masters, the defendant's conduct was primarily aimed

at a resident of the forum state.  In Panavision, defendant directly contacted Panavision in an

attempt to extort money for a domain name.  In Bancroft & Masters, defendant directly contacted

B&M to ask it to cease using a domain name.  Here, Topline's conduct was primarily aimed at Payless, in Kansas, when Topline was performing the buying agent services.

Because of that distinction, I believe that Topline's situation is more similar to Schwarzenegger, in which an Ohio car dealer ran advertisements in the Akron Beacon Journal which included a small photograph of Arnold Schwarzenegger portrayed as the Terminator, without Schwarzenegger's permission.  Schwarzenegger, 374 F.3d at 799.  The court reasoned: "Here, Fred Martin's intentional act–the creation and publication of the Advertisement–was expressly aimed at Ohio rather than California.  The purpose of the Advertisement was to entice Ohioans to buy or lease cars from Fred Martin and, in particular, to 'terminate' their current car leases."  Id. at 807.  The court held that even though Fred Martin might have known that Schwarzenegger lived in California, Fred Martin's express aim was local to Ohio so the advertisement was not expressly aimed at California.  Id.  Likewise, Topline's express aim was at Kansas as it found trends for Payless, had samples manufactured, presented the samples to Payless, and arranged for manufacturing.  The fact that the shoes allegedly infringed adidas' mark does not change Topline's aim to Oregon, just like the fact that Fred Martin used Schwarzenegger's image without permission did not change Fred Martin's aim to California.

I conclude that adidas has not met its burden for the purposeful direction prong under the effects test.

      B.    <u>Stream of Commerce Test</u>

Alternatively, adidas contends that Topline satisfies the stream of commerce test because it designed the shoes, sourced their manufacture, negotiated pricing, inspected for quality, and ensured shipment to Topline's customers who ultimately sold the shoes in retail stores in Oregon.

adidas claims that Topline reasonably anticipated some of the sales would be in Oregon because it was fully aware of its customer's established distribution systems.

Topline contends there is no evidence that it performed any buying services beyond helping the customer identify a design, finding an overseas manufacturer, and facilitating a purchase and sales agreement between Topline's customer and the manufacturer. According to Topline, the retailers, such as Payless, buy the shoes directly from the foreign manufacturers, import the shoes into the United States, and distribute the shoes to their retail outlets. Topline claims that it has no involvement in the customer's distribution of shoes. It argues that there must be more than a foreseeable result that a product will make its way to a particular market. Instead, defendant must perform concrete acts indicating an intent to serve the market in the forum state. Thus, Topline contends that it did not place the allegedly infringing shoes into the stream of commerce. Topline distinguishes cases cited by adidas as situations where the defendant purposefully shipped its own products into the forum through a distribution network the defendants owned, controlled, or set up.

> The placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state. Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987). Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state. Id.

Holland Am. Line v. Wartsila N. Am., 485 F.3d 450, 459 (9th Cir. 2007) (foreign seller of marine engine part which allegedly caused a fire on a cruise ship did not purposefully direct an act towards Washington, even though its products ended up in Washington, its marketing representatives occasionally visit other parts of the United States, it might have attended trade

shows and might have conducted training in other states, it advertised in marine publications but

did not specifically design the advertisement for the Washington market or heavily distribute the

advertisement there, and it had a passive website viewable in Washington which did not provide

a means to directly purchase parts or services.).

adidas relies on Hedrick v. Daiko Shoji Co., 715 F.2d 1355 (9th Cir. 1983), for its

statement that "where a defendant delivers its products into the stream of commerce with the

expectation that they will reach the forum state, the forum's court may assert personal

jurisdiction." Id. at 1358 (internal quotation omitted).  adidas notes that Hedrick was decided

before the Supreme Court's decision in Asahi, but argues that the Ninth Circuit has never

expressly overruled Hedrick.  The Ninth Circuit has noted, however:

> Hedrick is expressly disapproved in Asahi Metal Indus. Co. v. Superior Court,
> 480 U.S. 102, 111, 107 S. Ct. 1026, 1031-32, 94 L. Ed. 2d 92 (1987), so if that
> portion of Asahi is the law, then Hedrick is no longer the law of this circuit. . . .
>
> At least a majority and perhaps all the justices agreed in Asahi that
> jurisdiction cannot be founded on the mere presence of a product in the forum,
> where the product has not been marketed there, and its presence there is not part
> of the regular and anticipated flow of the of [sic] products from the manufacturer.
> Langsten did not purposefully avail itself of the Washington market.  In Asahi, the
> Court took note that the defendant did not maintain an office, agents, employees,
> or property in California; did not advertise or solicit business in the forum; did not
> create, control or employ the system which brought its product in anticipation of
> sales in the forum.  Asahi Metal Indus. Co., 480 U.S. at 112-13, 107 S. Ct. at
> 1032-33.  All the same factors exist in the case at bar.  Langsten took no
> "purposeful" action to cause the vessel it rebuilt to be located in Washington.

Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 271 (9th Cir. 1995) (in an injured

seaman's product liability suit, a foreign ship refurbisher did not purposefully avail itself of the

privilege of conducting activities in Washington, even though it purchased parts in Washington

at the request of the shipowner and knew the ship's home port would be in Washington but

performed the refurbishing overseas and delivered the ship overseas).  The <u>Omeluk</u> analysis

undercuts the <u>Hedrick</u> statement sufficiently that I find <u>Hedrick</u> is no longer binding precedent.

Although it was foreseeable that the shoes would be sold in Oregon, there is no evidence

of the "something more" that is required under <u>Asahi</u> and the Ninth Circuit cases explaining it.

In particular, there is no evidence that Topline ever held title to the shoes or was a part of the

distribution network that brought the shoes to Oregon.  Thus, I conclude that adidas has not met

its burden for the purposeful direction prong under the stream of commerce test.

Moreover, I note that the Honorable Janice Stewart found that the court had no personal

jurisdiction over another buying agent, Mercury, under very similar facts in <u>adidas America, Inc.</u>

<u>v. KMart Corporation</u>, Civ. No. 05-120-ST, 2006 WL 2668461 (D. Or. July 6, 2006).

II.    <u>Arising out of Forum-Related Activities</u>

The Ninth Circuit uses a "but for" test to determine whether a particular claim arises out

of forum-related activities, thus satisfying the second prong of the three-part test.  <u>Mattel, Inc. v.</u>

<u>Greiner and Haussner GMBH</u>, 354 F.3d 857, 864 (9th Cir. 2003) (but for defendant's contacts

with the forum, would plaintiff's claims against defendant have arisen?).  The focus is a broad

one, analyzing whether the entire course of events was made possible by defendant's contacts in

the forum state.

Topline argues that because it has engaged in no Oregon-related activities that give rise to

adidas's claims, the "but for" test cannot be met.  It claims that it did not design, manufacture,

import, sell, advertise, or conduct any other activities in Oregon concerning the allegedly

infringing shoes.

Page 14 - OPINION AND ORDER

adidas disagrees, arguing that but for Topline's conduct in designing, sourcing, and distributing infringing footwear for sale in its customers' retail stores throughout the country, including in Oregon, adidas would not have suffered harm in Oregon because the allegedly infringing shoes would not have been sold.

I agree with Topline that it has no contacts with Oregon related to the alleged infringement. Topline's Oregon contacts are limited to the purchase of a trade show booth from an Oregon company and use of an Oregon testing company, neither of which concerned the accused shoes sold at Payless. Accordingly, adidas has not satisfied the second prong of the test for specific jurisdiction, namely, whether the claim arises out of Topline's forum-related activities.

III.    <u>Summary</u>

Because adidas failed to satisfy the first two prongs of the test for specific jurisdiction, I decline to analyze the third prong, namely, whether the exercise of personal jurisdiction over Topline would be reasonable. I conclude that this court does not have personal jurisdiction over Topline.

**CONCLUSION**

Defendant The Topline Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (#27) is granted. This action is dismissed without prejudice.

IT IS SO ORDERED.

Dated this _____5th_____ day of May, 2009.

                                 _____/s/ Garr M. King_____
                                 Garr M. King
                                 United States District Judge